Doyle J. WILLIAMS, Appellant,

v.

Bill ARMONTROUT, Appellee.

No. 88–1342.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 19, 1988.

Decided Dec. 7, 1989.

Order on Grant of Rehearing En
Banc Feb. 6, 1990.*

* Opinion and judgment vacated.

Charles W. German, Kansas City, Mo., for appellant.

John M. Morris, Asst. Atty. Gen., Jefferson City, Mo., for appellee.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and FAGG, Circuit Judge.

BRIGHT, Senior Circuit Judge.

On September 17, 1981, a jury in Clay County, Missouri, convicted Doyle J. Williams of capital murder and sentenced him to death. After a long and circuitous appeal in the state courts to exhaust his claims, Williams petitioned the district court for a writ of habeas corpus. Williams now appeals the district court's denial of the writ. For the reasons stated below, we direct the district court to issue the writ vacating Williams' death sentence, but leave to the State of Missouri the choice of resentencing Williams on a lesser charge or retrying the capital murder case against him with appropriate instruction on first-degree murder as a lesser included offense.

## I. BACKGROUND

We relate the essential facts. On October 10, 1980, sheriff's deputies found the body of Kerry Brummett in the Missouri River. Brummett's arms had been handcuffed behind his back. Medical experts testified at trial that Brummett had drowned, although he had also been struck in the head. Police investigators later traced the handcuffs to Williams.

At trial, the State's case against Williams depended heavily on testimony by John Morgan, an alleged accomplice. Morgan testified that Williams had planned Brummett's murder to keep Brummett from testifying about drug-related charges in which both Williams and Morgan were allegedly implicated. According to Morgan, Williams arranged to have his then-girlfriend, Betty Coleman, lure Brummett to an isolated area near the Missouri River where Morgan and Williams sat waiting. A struggle ensued in which Williams and Morgan purportedly handcuffed Brummett and forced him into the trunk of a borrowed car. From there, the two men planned to transport Brummett to a pre-chosen location near the river bank, where they would shoot Brummett, weight his body with a tire iron, and dump him into the Missouri River.

The route taken, however, was less direct than the captors anticipated. First, the two men found campers at their planned point of entry. Then, Williams discovered he had lost his gun, which required a search of the vehicle and, ultimately, a return to the scene of the abduction to recover it. During this rendezvous, Brummett remained conscious and reportedly promised not to testify.

After recovering the weapon, the two captors drove several more miles before eventually stopping the vehicle at a secluded place near the bank of the Missouri River. At that time, Williams removed Brummett from the trunk. Brummett, then, reportedly got away from Williams and ran into the river.

What happened after this point remains unclear and subject to differing interpretations. According to Morgan, Williams chased Brummett to the edge of the river and then stood on the bank with Morgan and watched Brummett drown. When Brummett temporarily resurfaced, Williams reportedly ordered Morgan to shoot him. Morgan fired a shot, but claimed to have purposely aimed over Brummett's head. After Brummett drowned, Williams allegedly dove into the water and attempted to retrieve the handcuffs, which he feared might link him to the crime.

To challenge Morgan's account, Williams presented an alibi defense at trial. While Williams himself did not testify, a woman friend, Nina Potts, testified that Williams had been with her that evening.

Williams also tried to impeach Morgan's credibility. Specifically, Williams' counsel attempted to show that Brummett had been scheduled as a witness against Morgan only, indicating that Morgan, not Williams, had the motive to kill Brummett.

In addition, defense counsel tried to show that Morgan, also a suspect in the capital murder, implicated Williams to exculpate himself once the prosecution promised him immunity for doing so. Finally, defense counsel presented evidence that Morgan's testimony was untrustworthy because he had made several inconsistent statements to police and because Morgan admitted to drug use.

Williams raises several issues on appeal, including failure to instruct on the lesser included offense of first-degree (felony) murder, improper admission of other crimes evidence, prosecutorial misconduct, ineffective assistance of counsel, insufficiency of the evidence and improper wording of the capital murder instruction. We reverse the district court decision denying habeas relief on the lesser included offense issue, but affirm on all other points.

## II. DISCUSSION

### A. First–Degree (Felony) Murder Instruction

At trial, the judge instructed the jury on capital murder, second-degree murder and manslaughter. The judge refused to instruct the jury on first-degree (felony) murder, however, even though both Williams and the State requested the instruction.

■ Because of the capital charge, due process considerations entitled Williams to have the jury instructed on all lesser included offenses supported by the evidence. *Spaziano v. Florida,* 468 U.S. 447, 454, 104 S.Ct. 3154, 3158, 82 L.Ed.2d 340 (1984); *Hopper v. Evans,* 456 U.S. 605, 611, 102 S.Ct. 2049, 2052, 72 L.Ed.2d 367 (1982); *Beck v. Alabama,* 447 U.S. 625, 637–38, 100 S.Ct. 2382, 2389–90, 65 L.Ed.2d 392 (1980). *See also State v. Story,* 646 S.W.2d 68, 73 (Mo.1983) (en banc). At the time of Williams' trial, first-degree murder was a lesser included offense of capital murder under Missouri law. *State v. Daugherty,* 631 S.W.2d 637, 645 (Mo.1982); *State v. Fuhr,* 626 S.W.2d 379, 379 (Mo.1982).

While the Missouri Supreme Court held in *State v. Baker,* 636 S.W.2d 902, 904–05 (Mo.1982) (en banc), *cert. denied,* 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983), that felony murder was not a lesser included offense for capital murders occurring after January 1, 1979, the Missouri Supreme Court has applied *Baker* so selectively that we must conclude its only purpose has been to affirm convictions. *See, e.g., State v. Holland,* 653 S.W.2d 670, 680 (Mo.1983) (en banc) (Welliver, J., dissenting) ("The majority * * * has treated similarly situated defendants differently in a transparent effort to avoid granting them new trials."); *State v. Williams,* 652 S.W.2d 102, 117–18 (Mo.1983) (en banc) (Welliver, J., dissenting); *State v. Goddard,* 649 S.W.2d 882, 890–92 (Mo.1983) (en banc) (Welliver, J., dissenting), *cert. denied,* 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 689 (1983).

We document the Missouri Supreme Court's selective application of *Baker* to affirm convictions as follows. The Missouri Supreme Court initially applied *Baker* retroactively, thereby affirming three capital murder convictions in which trial courts neglected to give the first-degree murder instruction. *See State v. Blair,* 638 S.W.2d 739, 747 (Mo.1982) (en banc), *cert. denied,* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983); *State v. Woods,* 639 S.W.2d 818, 819 (Mo.1982); *State v. Betts,* 646 S.W.2d 94, 96 (Mo.1983) (en banc). The Missouri Supreme Court then changed course and held in *State v. Goddard,* 649 S.W.2d at 889, that *Baker* applied prospectively only. This ruling permitted the court to affirm a jury verdict of first-degree murder even though the State had charged only capital murder. In affirming the *Goddard* conviction, the Missouri Supreme Court reasoned that, in view of the State's long history of "instructing down" in capital cases, the trial court permissibly instructed the jury on first-degree murder when, as in *Goddard,* the same evidence supported conviction for either charge. *Id.* at 887–89.

Just four weeks later, however, the Missouri Supreme Court reversed its position again, this time holding that *Baker*'s retroactive application prohibited instruction on first-degree murder. *State v. Williams,*

652 S.W.2d at 112. This case affirmed Williams' conviction for capital murder. Shortly after *Williams,* the Missouri Supreme Court changed positions for the third time that year and affirmed a first-degree murder conviction based on *Baker*'s prospective application. *State v. Holland,* 653 S.W.2d at 673. Four years later, a Missouri Court of Appeals admitted it could not reconcile the *Williams* decision with other Missouri case law. *Rumble v. State,* 741 S.W.2d 283, 284–85 n. 2 (Mo.Ct. App.1987).

■ This selective application of *Baker* by the Missouri courts denies similarly situated defendants in capital murder cases equal protection of law in violation of the fourteenth amendment of the United States Constitution.[1] *See McCleskey v. Kemp,* 481 U.S. 279, 291 n.8, 107 S.Ct. 1756, 1766 n. 8, 95 L.Ed.2d 262 (1987); *Dobbert v. Florida,* 432 U.S. 282, 301, 97 S.Ct. 2290, 2302, 53 L.Ed.2d 344 (1977); *Andrews v. Shulsen,* 802 F.2d 1256, 1270–71 & n.11 (10th Cir.1986), *cert. denied,* 485 U.S. 919, 108 S.Ct. 1091, 99 L.Ed.2d 253 (1988). The equal protection clause prohibits states from applying laws unequally to achieve improper purposes. *Furman v. Georgia,* 408 U.S. 238, 249, 256, 92 S.Ct. 2726, 2731, 2735, 33 L.Ed.2d 346 (1972) (Douglas, J., concurring); *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886); *United States v. Falk,* 479 F.2d 616, 619 (7th Cir.1973) (en banc). *See also Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962); *Brown v. Parratt,* 560 F.2d 303, 304 n.3 (8th Cir. 1977). Moreover, the finality of capital punishment mandates that states insure reasonable, rational and fair procedures when imposing it. *Beck v. Alabama,* 447 U.S. at 637–38, 100 S.Ct. at 2389–90; *Gard-*

*ner v. Florida,* 430 U.S. 349, 357–58, 97 S.Ct. 1197, 1204–05, 51 L.Ed.2d 393 (1977). *See also Brown v. Parratt,* 560 F.2d at 304 (quoting *Furman v. Georgia,* 408 U.S. at 306, 309–10, 92 S.Ct. at 2760, 2762–63 (Stewart, J., concurring)). In *Shock v. Tester,* this court noted:

> The equal protection clause is directed to every form of state action—legislative, executive or judicial. It prohibits discriminatory administration of valid statutes.
>
> " * * * Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution. * * * "

405 F.2d 852, 855 (8th Cir.) (quoting *Yick Wo v. Hopkins,* 118 U.S. at 373–74, 6 S.Ct. at 1072–73) (further citation omitted), *cert. denied,* 394 U.S. 1020, 89 S.Ct. 1641, 23 L.Ed.2d 45 (1969).

Missouri law required the Missouri Supreme Court to review Williams' death sentence and to consider any errors Williams enumerated on appeal. Mo.Ann.Stat. §§ 565.014.1 to .2 (Vernon 1979). These procedural protections entitled Williams to meaningful review by the Missouri Supreme Court. *Roberts v. Louisiana,* 428 U.S. 325, 335–36, 96 S.Ct. 3001, 3007, 49 L.Ed.2d 974 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976); Mo.Ann.Stat. § 565.014 (Vernon 1979). *See also Spaziano v. Florida,* 468 U.S. at 466, 104 S.Ct. at 3165; *Gregg v. Georgia,* 428 U.S. 153,

1. While the State contends Williams failed to preserve his equal protection claim, this argument is meritless. Williams brought the equal protection issue to the attention of Missouri courts on direct appeal as well as during post-conviction proceedings. See Respondent's Exhibits B–2 at 28, G–1 at 63–64, G–2 at 4. Further, any contention that Williams failed to raise this claim at the time of his trial in 1980 is irrelevant under the circumstances presented here. Consistent with constitutional law, the

Missouri courts might have chosen to apply *Baker* either retroactively or prospectively to the time of Williams' trial. *See State v. Goddard,* 649 S.W.2d at 889 & n. 2. The equal protection violation of which Williams complains materialized only when, starting in 1982–83, the Missouri courts refused to adhere to a consistent standard in order to achieve an improper purpose. *See Griffith v. Kentucky,* 479 U.S. 314, 323, 107 S.Ct. 708, 713, 93 L.Ed.2d 649 (1987).

206, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859 (1976); *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976).

 Meaningful review of capital cases implies that state appeals court rulings must be rational and consistent. *State v. Bolder,* 635 S.W.2d 673, 684–85 (Mo.1982) (en banc) (quoting *Jurek v. Texas,* 428 U.S. at 276, 96 S.Ct. at 2958), *cert. denied,* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983). *See also Spaziano v. Florida,* 468 U.S. at 466–67, 104 S.Ct. at 3165–66; *Godfrey v. Georgia,* 446 U.S. 420, 431–32, 100 S.Ct. 1759, 1766–67, 64 L.Ed.2d 398 (1980); *Proffitt v. Florida,* 428 U.S. 242, 258–59, 96 S.Ct. 2960, 2969–70, 49 L.Ed.2d 913 (1976). State appellate courts must do more than cursorily rubber stamp trial court decisions. *Barclay v. Florida,* 463 U.S. 939, 973, 103 S.Ct. 3418, 3437, 77 L.Ed.2d 1134 (1983) (Stevens, J., concurring); *Gardner v. Florida,* 430 U.S. at 367, 97 S.Ct. at 1209 (Marshall, J., dissenting); *Proffitt v. Florida,* 428 U.S. at 258–59, 96 S.Ct. at 2969–70. Further, in reviewing capital cases, state appellate courts must abide by the constitutionally permissible constructions they establish. *See Godfrey v. Georgia,* 446 U.S. at 432, 100 S.Ct. at 1766.

In affirming Williams' conviction, the Missouri Supreme Court departed from standards it had established for lesser included offense submission and failed to apply the law with an even hand. Consequently, the only question remaining is whether the facts of Williams' case merited the first-degree murder instruction. We conclude that they did.

The trial judge explained his refusal to give the first-degree (felony) murder instruction as follows:

[T]he Court does not feel that there is evidence sufficient to submit on the felony murder theory. The reasoning behind that is that in this case the only evidence that I remember in this case is that the defendant, together with one John Morgan, set about with an intent and design to cause the death of the deceased in this case, Kerry Brummett.

The plan was, that is the evidence indicates, if the jury believes it, that they set about to have the aid and assistance of a female, Betty Coleman. And with the eventual intent being that the deceased would be killed and his body thrown in the Missouri River.

The Court feels that the kidnapping that took place later on in the evening was merely one link in the chain of events that had been planned by the defendant and John Morgan in committing the offense of murder.

Now, what I'm saying, I'm talking about what the evidence shows. I'm not saying that's my belief. That's what the evidence in the case would tend to show if believed by the jury.

Now, the Court feels that there is no evidence to the contrary. And the Court feels that there is no independent collateral felony to draw upon to create the crime of felony murder. And that if any, the kidnapping, would just be one of the circumstances planned by the two conspirators to cause the death of Kerry Brummett.

Trial Transcript at 613–14. See also Trial Transcript at 754–55.[2]

---

**2.** Similarly, the trial court refused to give a parallel instruction based on second degree murder, commenting:

Now then, insofar as an instruction of Second Degree murder under the felony murder doctrine, the Court also feels that that is not applicable since we would be talking about an assault, perhaps in the first degree or assault in the second degree.

And when you talk about committing an assault, *the only evidence in this case is that everything that was done was done with the intent to kill.* And, of course, assault in the first degree can carry an intent to kill, but if

that is carried to fruitation then it seems to me that it has to be converted into an intentional homicide. And, therefore, would be conventional second degree.

And I have, therefore, decided that we should submit the instruction on conventional Second Degree murder. And I am mindful of the recent decisions by the Supreme Court and the fact that there has been a recent reversal because of the failure to submit on First Degree murder. But, I do not believe that the facts in this case justify such a submission. And that in a felony murder case the felony involved must be an independent

■ The trial judge apparently recognized that some question of Williams' ultimate intent toward Brummett remained at issue, however, because he instructed the jury on second-degree murder and manslaughter. Neither second-degree murder nor manslaughter requires deliberate, planned intent to kill, and a court cannot give instructions the evidence does not support. *Hopper v. Evans*, 456 U.S. at 611, 102 S.Ct. at 2052; Mo.Ann.Stat. § 565.006.1 (Vernon 1979). If Williams' intentions had changed, then no murder plan remained, and the kidnapping stood alone.

■ The trial court's contrary conclusion notwithstanding, the evidence at Williams' trial supported a kidnapping-based first-degree murder instruction. Under Missouri law, an abduction committed in the course of another crime can support a separate kidnapping charge if the movement or confinement increases the risk of harm to the victim over and above that of the underlying offense. *State v. Erby*, 735 S.W.2d 148, 149 (Mo.Ct.App.1987); *State v. Jackson*, 703 S.W.2d 30, 33 (Mo.Ct.App.1985). In *Erby*, the Missouri Court of Appeals held that a sexual assault incident could support separate kidnapping charges when the defendant's choice to move the victim greatly facilitated commission of the crime. In *Jackson*, the court held that moving a sexual assault victim to a more secluded spot supported a separate kidnapping charge, even when the new location was only a block away. Both courts reasoned that moving the victim substantially increased the risk of harm because the re-

moteness and privacy of the location increased the victim's terror, reduced the probability of others witnessing the attack or capturing the defendant and made the victim's escape more difficult. *State v. Erby*, 735 S.W.2d at 149; *State v. Jackson*, 703 S.W.2d at 33. Under this rationale, Brummett's abduction supported a separate kidnapping charge because transporting Brummett to a secluded riverfront location facilitated Williams' and Morgan's dealings with Brummett, minimized the chance of detection and increased the likelihood that Brummett would be harmed.[3]

Even more importantly, Brummett's attempt to escape the abduction required the captors to make a conscious decision about how to proceed. At that moment of truth, Williams and Morgan, satisfied by Brummett's promises not to testify, could have decided to release Brummett. They also could have become merely indifferent to Brummett's ultimate destiny. In either case, had Brummett lived, the State could still have tried Williams and Morgan for kidnapping, even though the requisite intent for capital murder had fallen aside. *State v. Spencer*, 671 S.W.2d 433, 435 (Mo. Ct.App.1984). As Williams pointed out in a *pro se* letter to this court:

> The State also argues that there was no evidence to support a conviction of kidnapping. * * * Assuming the correctness of the State's evidence and [sic] the victim ran into the river in his efforts to escape[:] * * * What if the victim had went [sic] down the river and gotten out

collateral felony and not a felony that is involved in the murder itself.
Trial Transcript at 614–15 (emphasis added).

3. Even assuming Brummett's abduction had occurred purely in the context of a premeditated murder plan, the record in this case could still support an independent kidnapping charge. Section 565.110.1 of Vernon's Annotated Missouri Statutes (1979) defines kidnapping as
> unlawfully remov[ing] another without his consent from the place where he is found * * * for the purpose of
> \* \* \* \*
> (3) Interfering with the performance of any governmental * * * function; or
> (4) Facilitating the commission of any felony * * *; or

> (5) Inflicting physical injury on or terrorizing the victim * * *.
While the abduction in this case could satisfy the above elements in a number of ways, the jury, during the sentencing phase, found beyond a reasonable doubt that Williams acted to prevent Brummett from testifying. Because tampering with a witness in a felony proceeding is a class D felony, *see* Mo.Ann.Stat. § 575.270.2 (Vernon 1979), the abduction satisfied at least subsection (4) of the kidnapping statute. We find it noteworthy, as well, that this jury finding comprised the aggravating factor that permitted imposition of the death penalty in this case. *See* Mo.Ann.Stat. §§ 565.012.2(12), .012.5 (Vernon 1979 & Supp.1981).

and lived. Would the State have had enough evidence to convict Petitioner of kidnapping? Without question, the answer is yes. All the elements of kidnapping did not "go-a-way" upon the victim's death.

Letter from Doyle J. Williams to Robert D. St. Vrain (Dec. 29, 1988) (citation omitted).

■ Questions about witness credibility rest with the jury alone. *State v. Day*, 719 S.W.2d 291, 291–92 (Mo.Ct.App.1986); *State v. Dick*, 636 S.W.2d 425, 427 (Mo.Ct. App.1982). Morgan's testimony is the only direct evidence in this case of Williams' conduct at the scene of the crime. While Morgan's testimony, if believed in its entirety, may suggest Williams acted with premeditation, Morgan's status as an accomplice entitled the jury to believe all, some or none of his assertions. *State v. Day*, 719 S.W.2d at 291–92. Further, the defense presented considerable evidence impeaching Morgan. The defense developed Morgan's own interest in Brummett's death, as well as Morgan's considerable incentive for providing the prosecution with information that would merit a grant of immunity. Hence, the jury could have found that Morgan exaggerated or distorted Williams' misconduct to improve his own bargaining position.

Even without these motives for distortion, Morgan's account affords several bases for uncertainty about Williams' genuine intentions. Morgan himself testified that neither he nor Williams actually forced Brummett into the water or physically pushed him under. Morgan further testified that he, not Williams, shot at Brummett in the water, even though Williams was also armed. Moreover, Morgan's testimony that he fired over Brummett's head implied that Morgan, at least, had abandoned the plan to intentionally cause Brummett's death. The jury could have concluded that Williams had as well.

Circumstantial evidence presented at trial also permits varied conclusions about Williams' intentions. Because the handcuffs on Brummett's body linked Williams to the crime, the jury could reasonably have inferred Williams' presence at the time Brummett entered the water. The medical evidence, however, showed Brummett drowned. Additionally, State's experts could not determine the actual time or place of Brummett's death. Therefore, the jury could have concluded that Williams, though present, had allowed Brummett to swim away, and that Brummett drowned somewhere downstream unbeknownst to Williams.

The jury, not the judge, had the task of resolving these issues. In this case the trial judge could not assess the evidentiary support for a kidnapping-based first-degree murder instruction without first deciding questions of credibility and state of mind. Since the reasonable minds could have drawn differing inferences about Morgan's credibility and Williams' state of mind, these questions rested with the jury. *See State v. Nelson*, 674 S.W.2d 220, 224 (Mo. Ct.App.1984). *See also State v. McBurnett*, 694 S.W.2d 769, 772 (Mo.Ct.App.1985); *State v. Ellis*, 639 S.W.2d 420, 422–23 (Mo. Ct.App.1982).

■ The jury did not have the choice to convict Williams on a felony murder theory. This omission was crucial. In *Beck v. Alabama*, the Supreme Court vacated a death sentence for a capital crime where the trial judge, pursuant to state law, failed to instruct on the lesser included offense of felony murder. In overturning the death sentence, the Court said:

> For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.
>
> Such a risk cannot be tolerated in a case in which the defendant's life is at stake.

447 U.S. at 637, 100 S.Ct. at 2389.

Although the jury did receive instruction on second-degree murder and manslaughter, under the evidence of this case, the only real choice for a jury tending toward

conviction would fall between capital murder and first-degree murder. Under Missouri law, first-degree murder carries a mandatory life sentence and is significantly more serious than either second-degree murder (minimum sentence of ten years) and manslaughter (ten year maximum; $500 fine minimum). Mo.Ann.Stat. §§ 565.-008.2, 565.031 (Vernon 1979). Moreover, a kidnapping-based first-degree murder instruction would have allowed the jury to punish Williams for having had, at one time, the malignant intention required for capital murder, yet still permitted a finding that Williams ultimately abandoned the plan for Brummett's death.

By denying the first-degree murder instruction, the trial court deprived the jury of the opportunity to make this critical distinction. That distinction carried crucial importance under the facts presented here, and existing Missouri law entitled Williams to the instruction. Consequently, this case differs in nature and degree from *Tompkins v. Texas*, — U.S. ——, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989) (per curiam), *aff'g Tompkins v. State*, 774 S.W.2d 195 (Tex. Crim.App.1987). Accordingly, we vacate Williams' death sentence.

In vacating the death sentence, however, we note that Williams' case does not necessarily require retrial on the merits. *See Cabana v. Bullock*, 474 U.S. 376, 390–92, 106 S.Ct. 689, 699–700, 88 L.Ed.2d 704 (1986). The jury, given the choices of capital murder, second-degree murder and manslaughter, found sufficient evidence to convict Williams of capital murder. The jury also found Williams' actions sufficiently serious to merit the maximum penalty for that offense. Therefore, although the jury never actually evaluated Williams' actions under a first-degree murder theory, Williams should have no complaint if the State resentences him under the then-lesser included offense of first-degree murder to a maximum of life imprisonment. *Id.* Of course, the State may still seek the death penalty, but equal protection and due process concerns require the State to grant Williams a new trial if the State chooses to pursue that course. *See Beck v. Alabama*, 447 U.S. at 645–46, 100 S.Ct. at 2393–94;

*Yick Wo v. Hopkins*, 118 U.S. at 374, 6 S.Ct. at 1073.

B. Other Crimes Evidence

█ At trial, the court allowed the State to introduce, over Williams' objections, other crimes evidence related to drug charges about which Brummett had been slated to testify. Specifically, the trial court permitted testimony that Williams, with Morgan, had burglarized a doctor's office in Ausvasse, Missouri, stolen blank prescription pads, used the blank pads in an aborted effort to obtain controlled substances, and that Williams had later killed the doctor to prevent him from testifying about the offense. The court further permitted testimony that Williams and Morgan discussed both the burglary and their plans for using the prescription pads in front of Brummett, and that Brummett had seen the pads, which bore the doctor's name.

The above evidence portrayed Brummett's death as part of a larger plan to conceal commission of the drug offense and suggested, as well, that Williams had reason to wish Brummett dead. *See State v. Williams*, 652 S.W.2d at 110. Thus, Missouri law permitted introduction of the evidence to show both motive and common scheme or plan. *See State v. Trimble*, 638 S.W.2d 726, 732 (Mo.1982) (en banc), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1031 (1983). Further, we agree with the district court, *see Williams v. Armontrout*, 679 F.Supp. 916, 927 (W.D. Mo.1988), that admission of this evidence did not unduly prejudice Williams' right to a fair trial. *Britton v. Rogers*, 631 F.2d 572, 576 (8th Cir.1980), *cert. denied*, 451 U.S. 939, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981). *See also Mercer v. Armontrout*, 844 F.2d 582, 586–87 (8th Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988); *Manning–El v. Wyrick*, 738 F.2d 321, 323 (8th Cir.) (per curiam), *cert. denied*, 469 U.S. 919, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984).

█ Additionally, the trial court properly refrained from instructing the jury about the permitted use of other crimes

evidence. Williams' counsel made no request for such instruction, and the record indicates counsel may have consciously foregone the instruction to avoid further emphasizing the misconduct evidence presented. *See Williams v. Armontrout,* 679 F.Supp. at 928, 945. Absence of such instruction does not violate due process under these facts. *See Williams v. Lockhart,* 736 F.2d 1264, 1267–68 (8th Cir.1984).

### C. Sufficiency of Evidence and Capital Murder Instruction

Williams contends the trial court impermissibly lowered the standard of proof for capital murder by instructing the jury only that it must find Williams had caused the "death" of Kerry Brummett, not caused his "killing." Williams further contends that a rational jury could not have concluded beyond a reasonable doubt that Williams caused the death of Brummett "by beating and drowning him" because undisputed evidence showed Brummett died from drowning alone. For the reasons stated by the district court, we reject these contentions. *See Williams v. Armontrout,* 679 F.Supp. at 928–29. The prejudice to Williams, if any, from these variations in wording does not comprise a fundamental defect inherently resulting in a complete miscarriage of justice. *See Cupp v. Naughten,* 414 U.S. 141, 147, 149–50, 94 S.Ct. 396, 400, 401–02, 38 L.Ed.2d 368 (1973); *Berrisford v. Wood,* 826 F.2d 747, 752–54 (8th Cir.1987), *cert. denied,* 484 U.S. 1016, 108 S.Ct. 722, 98 L.Ed.2d 671 (1988); *Brouillette v. Wood,* 636 F.2d 215, 218–19 (8th Cir.1980), *cert. denied,* 450 U.S. 1044, 101 S.Ct. 1766, 68 L.Ed.2d 243 (1981). *See also State v. Daugherty,* 631 S.W.2d at 639–41.

### D. State Post–Conviction Proceedings

For the remaining issues of this appeal we adopt the Missouri state court's factual findings, noting that they are supported in the record and, thus, presumptively correct. *See Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983); *Frank v. Brookhart,* 877 F.2d 671, 674–75 (8th Cir.1989). We reject Williams' remaining claims on the merits, but note, as well, that the district court concluded Williams procedurally defaulted on many of these issues. *See Williams v. Armontrout,* 679 F.Supp. at 930–33. We do not decide the merits of State allegations that Williams deliberately bypassed state remedies here, however.

#### 1. Prosecutorial Misconduct

Williams alleges numerous instances of prosecutorial misconduct. First, Williams alleges that law enforcement officers concealed reports of two witnesses, Larry Pirner and Pamela Mealey, who claimed to have seen Brummett with a woman who was not Betty Coleman shortly before the murder. The Missouri courts found no credible evidence that these reports were ever made, however. Williams' contention therefore fails because, as the district court reasoned, *see* 679 F.Supp. at 933, 934, the state cannot suppress evidence it does not possess. *See United States v. Smith,* 538 F.2d 1332, 1334 (8th Cir.1976).

Second, Williams contends the prosecutor improperly influenced his decision to not call a potential alibi witness, Robert Day, to testify he had seen Williams at home on the night of Brummett's murder. Allegedly, the prosecutor told Williams that an impeachment witness, Debbi Salmons, would testify that Day had confused the date, but did not disclose that Salmons herself had admitted uncertainty. As the district court reasoned, Williams failed to establish that the testimony would have helped his defense because both Salmons and Day expressed uncertainty about critical information. *See Williams v. Armontrout,* 679 F.Supp. at 938–39. Further, Day's account established, at most, that Williams had been at home four hours prior to Brummett's murder—which hardly eliminated him as a suspect. Thus, Williams failed to demonstrate that the prosecution withheld favorable or material evidence. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963).

Third, Williams claims the prosecutor suppressed evidence that the police coerced State's witness Barbara Rea to testify

against him. Williams' argument lacks merit. As the district court noted, the state court found no credible evidence of coercion. *See Williams v. Armontrout,* 679 F.Supp. at 937. Further, even if coercion had been demonstrated, Williams failed to show that disclosure would have altered the jury verdict. *See United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

Finally, Williams asserts the prosecutor misrepresented the true nature of Morgan's immunity agreement, leading defense counsel to believe that Morgan received broader immunity than the prosecutor, in fact, had authority to grant. We have rejected this claim once on appeal already in a related case. *Williams v. Armontrout,* 877 F.2d 1376, 1383 & n. 2 (8th Cir.1989). We also agree with the district court, *see* 679 F.Supp. at 932–33, 936–37, that the alleged miscommunication of Morgan's immunity neither prejudiced Williams nor influenced the outcome of his trial. *See United States v. Bagley,* 473 U.S. at 682–83, 105 S.Ct. at 3383–84.

2. Ineffective Assistance of Counsel

Williams alleges numerous instances of ineffective assistance of counsel, including insufficient pretrial investigation, ineffective cross-examination of state's witnesses, failure to call potentially helpful witnesses, and failure to request cautionary instruction on other crimes evidence and Morgan's credibility. We agree with the district court's well-reasoned opinion that Williams' ineffective assistance claim lacks merit. *See Williams v. Armontrout,* 679 F.Supp. at 940–49. Williams failed to show that trial counsel performed deficiently, much less committed errors sufficient to undermine the fairness of Williams' trial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

III. CONCLUSION

We reverse the district court's order denying Williams' petition for habeas corpus relief on the issue of lesser included offense instruction. Accordingly, we direct the district court to issue a writ of habeas corpus vacating Williams' death sentence, but leave to the State of Missouri the choice of resentencing Williams for first-degree murder or retrying the capital murder case against him with appropriate instruction on first-degree murder. We affirm the district court order denying habeas relief for all remaining issues.

FAGG, Circuit Judge, dissenting.

The court's holding that Williams's conviction for a thoroughly brutal and calculated murder must be overturned because he was constitutionally entitled to "a kidnapping-based [felony] murder instruction," *ante* at 661, totally misses the mark. I thus dissent.

Missouri law does not recognize as a separate offense an abduction that is part and parcel of a premeditated murder plan. Under this controlling legal principle, when conduct that might otherwise satisfy the elements of a kidnapping is "merely incidental" to capital murder, no separate felony has occurred that will trigger giving a felony murder instruction. *State v. Erby,* 735 S.W.2d 148, 149 (Mo.Ct.App.1987); *see, e.g., State v. Jackson,* 703 S.W.2d 30, 32–33 (Mo.Ct.App.1985); *State v. Jackson,* 703 S.W.2d 23, 24–25 (Mo.Ct.App.1985); *State v. Stewart,* 615 S.W.2d 600, 602–04 (Mo.Ct.App.1981); *State v. Johnson,* 549 S.W.2d 627, 630–33 (Mo.Ct.App.1977); *see also State v. Coleman,* 660 S.W.2d 201, 209–10 (Mo.Ct.App.1983). In deciding whether an abduction is incidental to capital murder, the state trial court is required to consider the evidence presented at the defendant's trial and determine whether the abduction substantially increased the risk of harm to the victim beyond the risk inherent in the principal crime. *See, e.g., Erby,* 735 S.W.2d at 149; *Jackson,* 703 S.W.2d at 31–33; *Jackson,* 703 S.W.2d at 24–25; *Stewart,* 615 S.W.2d at 604; *Johnson,* 549 S.W.2d at 631–33. Based on the evidence in this case, I agree with the state trial court that Williams's conduct did not rise to the level of a separate kidnapping. Thus, the evidence did not show a separate felony that would support the requested felony murder instruction.

The state trial court was aware of this critical principle of Missouri law and clearly appreciated its significance in Williams's case. In refusing to give the kidnapping-

based felony murder instruction requested by Williams, the trial court stated:

> The [c]ourt ... does not feel ... there is evidence sufficient to submit on the felony murder theory. The ... only evidence ... is that [Williams], together with one John Morgan, set about with an intent and design to cause the death of the deceased in this case, Kerry Brummett.
>
> The plan was ... that [Brummett] would be killed and his body thrown in the Missouri River.
>
> The [c]ourt feels that the kidnapping that took place ... was merely one link in the chain of events that had been planned by [Williams] and John Morgan in committing the offense of murder.
>
> Now, what I'm ... talking about [is] what the evidence shows. I'm not saying that's my belief. That's what the evidence in the case would tend to show if believed by the jury.
>
> Now, the [c]ourt feels ... there is no evidence to the contrary. [Thus,] ... there is no independent collateral felony to draw upon to create the crime of felony murder.... [T]he kidnapping ... would just be one of the circumstances planned by the two conspirators to cause the death of Kerry Brummett.

State Trial Tr. at 613–14.

The court's timid characterization of the evidence in this case in my view is decidedly naive. Brummett was slated from the outset to be killed. This was so because Williams was bent on eliminating witnesses who might implicate him in the burglary of a doctor's office. To this end Williams had already murdered the unfortunate doctor. *See Williams v. Armontrout,* 877 F.2d 1376, 1378 (8th Cir.1989). Because Brummett could also tie Williams to the burglary, he was likewise targeted for murder. The panel's suggestion that "transporting Brummett to a secluded riverfront location ... increased the likelihood that [he] would be harmed," *ante* at 661, is out of focus with a real world view of the undisputed evidence. Brummett's abduction and movement in the trunk of a car did nothing to intensify the risk he faced from the beginning. Instead, this was the method of accomplishing the plan to murder Brummett and dispose of the body secretly.

The happenings at the river's edge are neither "unclear" nor "subject to differing interpretations." *Id.* at 657. While Morgan obtained a rope and weight to dispose of Brummett's body, Williams brutally beat the handcuffed victim-to-be. No doubt sensing the men's intentions, Brummett selected from his rapidly dwindling options and ran into the river. Williams was in hot pursuit. Brummett immediately sank. After Brummett surfaced for the second time, Williams ordered Morgan to shoot him. Despite Morgan's later explanation that he aimed and fired over Brummett's head, Williams's unadorned order eloquently refutes the court's perception that at the "moment of truth" Williams was "merely indifferent to Brummett's ultimate destiny," had "abandoned the plan to intentionally cause Brummett's death," and "allowed Brummett to swim away." *Id.* at 661–62. Although Williams had the opportunity to rescue Brummett, he entered the water only in an attempt to retrieve incriminating handcuffs from the body of a drowned man.

In a nutshell, the record of Williams's trial does not furnish any reasonable evidentiary basis for giving an instruction on Williams's theory of a separate kidnapping. Indeed, in a related prosecution, Williams's girlfriend claimed she was entitled to a felony murder instruction because Brummett's abduction was a kidnapping. *See Coleman,* 660 S.W.2d at 208. The Missouri Court of Appeals recognized at once that as a matter of state law "there [was] no evidence that Brummett was kidnapped ... within the meaning of the [kidnapping] statute." *Id.* at 210. Instead, the court held the evidence showed "[Coleman], Morgan, and Williams planned the 'luring' of Brummett to a predetermined location for the express purpose of murdering him.... The transportation of Brummett without his consent was merely the physical means to complete the murder." *Id.* I completely agree.

Because the evidence did not support Williams's claim that Brummett's abduction was a separate felony, the state trial court's refusal to give the requested instruction on the lesser included offense of felony murder did not violate due process. *See Hopper v. Evans,* 456 U.S. 605, 611, 102 S.Ct. 2049, 2052, 72 L.Ed.2d 367 (1982); *Beck v. Alabama,* 447 U.S. 625, 637–38, 100 S.Ct. 2382, 2389–90, 65 L.Ed.2d 392 (1980). Similarly, despite the Missouri Supreme Court's seemingly inconsistent application of its precedents on this point, Williams's equal protection claim necessarily fails when the evidence presented in his case did

not fit within the state law principles entitling him to the felony murder instruction in the first instance.

Thus, I would affirm the district court's denial of Williams's petition for a writ of habeas corpus.

### ORDER

The panel opinion filed and the judgment entered on December 7, 1989, are vacated, and appellee's suggestion for rehearing en banc is granted. The date for rehearing will be set down at a future time.

Counsel may simultaneously file, within thirty (30) days of the date of this order, supplemental briefs which are not duplicative of the briefs originally filed. The supplemental briefs shall not exceed fifteen (15) pages in length. Counsel shall submit sixteen (16) copies of these supplemental briefs.